## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re **CHARLES R HUGHES**, Debtor. | Case No. **08-60003-12** |
| **VALLEY BANK OF RONAN**, Plaintiff. -vs- **CHARLES R HUGHES**, Trustee under Charles R. Hughes Loving Trust, **COUNTRY WIDE HOME LOANS INC**. **(Dismissed)**, and **FIDELITY NATIONAL TITLE INSURANCE COMPANY (Dismissed)**, Defendants. | Adv No. **08-00030** |

## MEMORANDUM  OF  DECISION

At Butte in said District this 17th day of November, 2008.

Defendant/Debtor Charles R. Hughes filed his bankruptcy case on January 3, 2008.

Plaintiff commenced this adversary proceeding on April 3, 2008, by removing a state court case

filed in the Montana Twentieth Judicial District Court, Lake County during February, 2003, and

captioned *VALLEY BANK OF RONAN, Plaintiff, vs. CHARLES R. HUGHES, Trustee under*

*Charles R. Hughes Loving Trust; COUNTRYWIDE HOME LOANS, INC.; and FIDELITY*

*NATIONAL TITLE INSURANCE COMPANY, Defendants*, Cause No. DV-03-28.  On August 15,

1

2008, Plaintiff ("Valley Bank") filed an objection to the jury trial demand, doc. # 54, requested by Defendant Charles R. Hughes, Trustee under Charles R. Hughes Loving Trust ("Hughes"). Hughes requested an extension of time to respond, doc. # 55, which this Court granted, doc. # 56. On September 5, 2008, Hughes filed a response, doc. # 59, and scheduled a hearing for October 9, 2008. The parties filed briefs in support of their respective positions. On October 9, 2008, Trent Baker, of Missoula, MT appeared on behalf of the Valley Bank and James A. Patten, of Billings, Montana, and G. Patrick HagEstad, of Missoula, Montana, appeared on behalf of Hughes. The parties presented their arguments and the Court took the matter under advisement. After considering Valley Bank's objection, Hughes' response and the respective briefs, the Court is ready to issue its decision. Valley Bank's objection to Hughes' demand for a jury trial is sustained for the reasons set forth herein.

## BACKGROUND

Valley Bank, as noted, filed the state court action during February, 2003. Hughes filed his answer, counterclaim and demand for jury trial on March 17, 2003. The initial facts are contained in the Montana Supreme Court decision, *Valley Bank of Ronan v. Charles R. Hughes, Trustee under Charles R. Hughes Loving Trust*, 2006 MT 285, 334 Mont. 335, 147 P.3d 185, and are as follows:

¶ 6 The District Court's approach to the factual issues in this matter was set forth in its summary judgment order:

The facts set forth herein are Hughes' "version" of the facts. While several are contested by Valley Bank, the Court has assumed these facts to be true in analyzing the Motion for Summary Judgment presented by Valley Bank.

On appeal, the parties have utilized the same framework. In its appellate briefing,

2

Valley Bank urges us to "likewise test Hughes' facts and determine whether Valley is entitled to judgment as a matter of law." Except for an argument it makes in response to defenses raised by Hughes to foreclosure of the promissory note, wherein it asserts that Hughes has not raised a genuine issue of material fact, Valley Bank urges us to rule that it was entitled to judgment as a matter of law "assuming [Hughes'] facts to be true." Thus, except as otherwise noted, we consider the issues raised herein under that portion of the summary judgment standard of review, *see* ¶ 14, infra, which requires us to determine whether the movant is entitled to judgment as a matter of law.

¶ 7 Lured by the promise of quick wealth, Hughes was conned by a " Nigerian scam." The swindlers promised Hughes a $3 million to $4.5 million commission for his aid in procuring agricultural equipment for import into Africa and then proceeded to bilk him for hundreds of thousands of dollars in advanced fees. At least some of the funds Hughes advanced were wired via the services of Valley Bank, resulting in a dispute over which party should bear the loss from the flimflam.

¶ 8 On Friday, March 22, 2002, Hughes received four checks from one of the con-artists and deposited them into accounts Hughes held at Valley Bank. Two of them were "official" checks, and the other two were personal checks. One official check, for $1 million, was drawn on Colonial Bank. The other official check, for $500,000, was drawn on Firstar. The personal checks were for $62,000-drawn on the account of Maximilian H. Miltzlaff-and for $70,000-drawn on a Capital One credit card account held by Sarah Briscoe and Mary Bullard.

¶ 9 Prior to depositing the checks, Hughes requested that Nancy Smith, a cashier and officer of Valley Bank, verify the validity of the official checks. In his deposition, Hughes described his conversation with Smith:

> Well, my question was, how long do you have to hold money to have-how long do you have to hold these checks before they're sufficient funds; I think the bank calls them collected funds. And she said, these are official checks, Chuck. These two big ones are official checks. You will be transferring these? And I said I will be transferring a large sum. We'll have to determine next week what it will be. And she says, official checks, same as cash. You can do whatever you want to do.

Smith also assured Hughes that official checks were "just like" cashier's checks. Milanna Shear, another bank employee, told Hughes to believe whatever Smith said regarding the validity of the checks. According to the deposition testimony of Hughes' wife, Barbara, Hughes had told her that "everybody at the bank assured

3

him that the checks would be good."

¶ 10 On Tuesday, March 26, 2002, Hughes delivered a written request to Valley Bank to wire $800,000 to Ali dh. Abbas, an accountholder at the Housing Bank for Trade and Finance in Amman, Jordan. Valley Bank executed the transfer no later than 1:51 p.m. on the same day. The transfer proceeded through two intermediary banks, Wells Fargo, near Denver, Colorado, and Citibank in New York, before being sent to Amman. Upon receipt in Amman, the funds were promptly withdrawn, never to be seen again.

¶ 11 At about 2:00 p.m.-approximately ten minutes after initiation of the transfer-Valley Bank and Hughes learned that one of the personal checks was being returned marked "nonsufficient funds." Hughes immediately requested the wire to be stopped. No later than 3:26 p.m. Valley Bank requested that Wells Fargo reverse the wire transfer. The record is unclear about what happened during the interim between Hughes' request for cancellation and Valley Bank's attempts to comply with the request. The efforts of the several banks involved in the transfer to reverse the transaction were unsuccessful, and the later discovery that the two official checks were counterfeit resulted in Hughes' account being overdrawn by $800,000.

¶ 12 Valley Bank subsequently exercised its right to charge back the account and collect the $800,000 from Hughes. Allen Buhr (Buhr), Valley Bank's president, met with Hughes on March 29, 2002, to discuss Hughes' liability and suggested at that time that Hughes could be involved in a criminal prosecution for fraud. On April 11, 2002, Hughes deposited $607,838, which he had withdrawn from his retirement account, into the Valley Bank account. Also, on April 30, 2002, Hughes executed a promissory note to Valley Bank on behalf of his trust in the amount of $400,000, secured by mortgaged property. Of the $400,000 in proceeds generated by the secured note, $202,751.21 was used to pay off a previous loan against the mortgaged property, and the balance, $197,248.79, was applied to satisfy the charge-back liability in Hughes' account. Hughes was under the impression, given by Buhr, that the bank needed the note and loan agreement because it expected to be the subject of a government audit in the near future, and though Hughes thought that a new agreement might be reached after resolution of the "fraud situation," he understood that the loan may not be forgiven. The trust subsequently made the first interest payment on the note on August 1, 2002, though it was one month late. The trust made no other payments on the note, and Valley Bank sent a notice of default and acceleration on October 15, 2002. Hughes requested that the bank forebear foreclosure until the end of the year, and the bank complied. However, when Hughes failed to make any more payments on the note, Valley Bank initiated an action for judicial foreclosure. Hughes asserted counterclaims of negligence, negligent misrepresentation, constructive fraud,

4

unjust enrichment, breach of contract, breach of the implied covenant of good
faith and fair dealing, promissory estoppel, and intentional infliction of emotional
distress (which was later abandoned).

¶ 13 On April 15, 2005, the District Court granted Valley Bank's motion *in limine*
to exclude Cynthia Shea as an expert witness for Hughes. In an order dated April
20, 2005, the District Court granted Valley Bank summary judgment on Hughes'
counterclaims. On the same day, the District Court granted Valley Bank summary
judgment on its claims regarding the promissory note. From these orders Hughes
appeals.

*Valley Bank of Ronan*, 2006 MT 285, ¶¶ 6 - 13, 334 Mont. 335, ¶¶ 6 - 13, 147 P.3d 185, ¶¶ 6 -
13.

The supreme court reached the following conclusions in its opinion:

¶ 47 The District Court correctly concluded that Valley Bank did not violate the
UCC-defined duty of ordinary care in processing the checks. Thus, it did not err
by granting summary judgment to Valley Bank on the promissory note and did not
err by excluding  Shea's testimony, and we affirm on those issues.

¶ 48 The District Court erred by failing to consider whether common law and
equitable principles supplement the UCC-defined duty of ordinary care with
respect to the bank's representations about the check settlement process.
Therefore, we reverse the District Court's order with regard to Hughes'
counterclaims based upon those representations and remand for further
proceedings.

¶ 49 Affirmed in part, reversed in part, and remanded for further proceedings.

*Valley Bank of Ronan*, 2006 MT 285, ¶¶ 47 - 49, 334 Mont. 335, ¶¶ 47 - 49, 147 P.3d 185, ¶¶ 47
- 49.

The supreme court further affirmed Judge McNeil's ruling that Hughes expert, Cynthia

Shea, be disqualified.  *Id.* at ¶ 45.  Upon remand, the Honorable W. John Larson was

subsequently substituted for the Honorable C. B. McNeil, state court doc. #185.   Judge Larson in

his order, dated June 29, 2007, state court doc. # 199, denying Hughes' motion to stay Sheriff's

sale; granting motions to dismiss Counts III, IV, V, VI, VII and VIII of Hughes Counterclaim in

5

part; and denying Hughes motion to amend, stated:

> Therefore, this Court concludes the only remaining claims are Counts I and II.  This Court further concludes the Montana Supreme Court on remand limits these remaining claims.  Based on the directive of the Montana Supreme Court, these Counts are limited to common law and equitable principles and whether these supplement the UCC-defined duty of ordinary care with respect to the alleged misrepresentations about the check settlement process, and are limited to those representations. [*Valley Bank of Ronan*], ¶¶ 29, 49.

Subsequent to Judge Larson's order, state court doc. # 199, Hughes removed the remanded case to this Court on April 3, 2008.

In the main bankruptcy case, Case No. 08-60003, Valley Bank filed proof of claim no. 8-1 in the amount of $730,373.45.  On May 6, 2008, Hughes objected to proof of claim no. 8-1, main case doc. # 29, and alleges that the

> claim is subject to an offset for the [Hughes] counterclaim against [Valley Bank], which counterclaim is currently pending before this Court as Adversary No. 08-00030.  Both [Valley Bank's] claim and [Hughes'] counterclaim spring from the same state court lawsuit. [Valley Bank's] claim has been liquidated by summary judgment and Hughes' counterclaim is pending.  The claim of [Valley Bank] should be reduced, as appropriate, by the award to [Hughes] upon resolution of [Hughes'] counterclaim.

On June 11, 2008, Hughes filed a motion, main case doc. # 39, to consolidate, his objection to Valley's claim with the pending adversary proceeding.  Valley did not oppose the motion and this Court granted the motion to consolidate on June 11, 2008, main case doc. # 41.  Consequently, Counts I and II remain triable in this adversary proceeding and "are limited to common law and equitable principles and whether these supplement the UCC-defined duty of ordinary care with respect to the alleged misrepresentations about the check settlement process, and are limited to those representations." *Valley Bank of Ronan*, 2006 MT at ¶¶ 29, 49, 334 Mont. at ¶¶ 29, 49, 147 P.3d at ¶¶ 29, 49.  As Hughes' objection to Valley Bank's proof of claim

6

has been consolidated with this adversary proceeding, any award of damages obtained by Hughes

may be offset against the filed proof of claim after the Court determines whether any attorney's

fees claimed in the proof of claim are allowable.

## CONTENTIONS

Valley Bank contends in its initial brief that Hughes by voluntarily filing a chapter 12

bankruptcy case and by being a defendant in an adversary case with alleged counterclaims against

Valley Bank, which has filed a proof of claim, has no right to a jury trial under the persuasive

authority of *Hickman v. Hana (In re Hickman)*, 384 B. R. 832 (9th Cir. BAP 2008). In Valley

Bank's reply brief, it contends that the test enunciated in *Granfinanciera v. Nordberg*, 492 U.S.

33, 109 S.Ct. 2782 (1989), is inapplicable to Hughes' counterclaims, that Hughes counterclaims

are sufficiently related to the bankruptcy so as to become a matter of equity, and that Hughes

waived his right to a jury trial when he filed bankruptcy.

Hughes contends in its brief that Hughes satisfies the *Granfinanciera* test; that the

adversary proceeding does not adjudicate a creditor's claim, and that Hughes did not waive a jury

trial right by filing bankruptcy.

## DISCUSSION

A party's right to a jury trial is grounded in the Seventh Amendment to the United States

Constitution, which provides that "[i]n Suits at common law, where the value in controversy

shall exceed twenty dollars, the right of a trial by jury shall be preserved. . . ."  U.S. CONST.

amend. VII.  The Seventh Amendment only preserves the right to a jury trial for suits at common

law, not suits based in equity.  To ascertain whether a party has a Seventh Amendment right to a

jury trial, the Supreme Court, in *Granfinanciera,* articulated a three-part test for determining

7

whether claims are legal or equitable: "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." 492 U.S. at 42, 109 S.Ct. 2782 (quoting *Tull v. United States,* 481 U.S. 412, 417-418, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987)).  However, the Supreme Court reiterated that "characterizing the relief sought is '[m]ore important' than finding a precisely analogous common-law cause of action in determining whether the Seventh Amendment guarantees a jury trial." *Tull*, 481 U.S. at 421, quoting *Curtis v. Loether*, 415 U.S. 189, 196, 94 S.Ct. 1005, 1009, 39 L.Ed.2d 260 (1974). Finally, "if, on balance, [the] above two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, [a court] must [then] decide whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as a factfinder [private versus public rights]." *Granfinanciera,* 492 U.S. at 42.

In applying the first two factors of the *Granfinanciera* test to the allegations contained in Counts I and II of Hughes' counterclaims, negligence and negligent misrepresentation, little doubt exists that the remedy for compensatory damages sought by Hughes and the nature of his claims are legal in nature.  *See Frost, Inc., v. Miller, Canfield, Paddock & Stone, P.C. ( In re Frost, Inc.)*, 149 B.R. 878, 882 (Bankr. W.D. Mich. 1992); *Granfinanciera*, 492 U.S. at 50, 109 S.Ct. at 2795 ("Congress may only deny trials by jury in actions at law, . . . in cases where 'public rights' are litigated: 'Our prior cases support administrative factfinding in only those situations involving 'public rights,' *e.g.*, where Government is involved in its sovereign capacity under an otherwise valid statute creating public rights.  Wholly private tort, contract, and property cases, as well as a vast range of other cases, ar not at all implicated." (Citation omitted).

The Court must consider the third factor and determine whether private or public rights are implicated.

> [A] party does not have a right to a jury trial "for cases 'involving statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to ... a specialized court of equity,' " because those rights are deemed " 'public.' " *Germain*, 988 F.2d at 1331 (quoting *Granfinanciera*, 492 U.S. at 55 n. 10, 109 S.Ct. at 2797 n. 10). The *Germain* court further explained that the action "must be inextricably intertwined with a public right; the 'involvement' may not be casual or vague." *Id.* In *Germain*, the Second Circuit held that the trustee's action did not "bear[ ] a close nexus to any statutory public right" because it did not affect "the essence of the bankruptcy regulatory scheme of allowing or reordering claims." *Id.* However, if a party's action is inextricably intertwined with a statutory public right, such as the bankruptcy regulatory scheme of allowing or reordering claims, then the party does not have a Seventh Amendment right to a jury trial. *Id.*

*MCA WorldCom Communications, Inc. v. Communications Network Int'l, Ltd. (In re WorldCom)*, 378 B.R. 745, 751 -752 (Bankr. S.D.N.Y. 2007).  Is the claim "inextricably intertwined with a public right – the claims-allowance process[?]" *Id.* at 752.  If so, Hughes does not have a jury trial right as to its alleged counterclaims.

A legal action entitling a party to a jury trial does not magically convert to an equitable proceeding simply because it is connected to a bankruptcy proceeding.  *Id.* at 752 (citing *Germain*, 988 F.2d at 1329).  A legal action does convert into an equitable proceeding when it becomes part of a claims-allowance process because determining distributions in a bankruptcy case is characteristically equitable.  *Id.*  If the validity of a proof of claim or its monetary amount, including offsets against a creditor's claim due to a debtor's counterclaim, must be determined then the claims-allowance process is invoked and a jury trial right is given up. *Id.* at 753-54.  The claims-allowance process is integrally related to the equitable reordering and restructuring of the debtor-creditor relationship through the court's equity jurisdiction and a party subjects oneself to

9

the court's equitable power.  *Id.* at 753. *See also Langenkamp v. Culp*, 498 U.S. 42, 44, 111 S.Ct. 330, 331 (1990) (per curiam) and *Hickman*, 384 B.R. at 837, 839.

In the state court action, Valley Bank initiated its foreclosure suit and Hughes counterclaimed through the allegations of several counts that have been reduced by the Montana supreme court opinion as noted above.  The Montana supreme court stated:  "[W]hile Hughes bore the obligation to repay Valley Bank to satisfy the bank's right of charge-back under 30-4-212, MCA, it nevertheless is possible for Hughes to obtain a judgment to compensate him for the charge-back debt, though we express no opinion on the ultimate merits of these common law claims in this case." *Valley Bank of Ronan*, 2006 MT at ¶ 23, 334 Mont. at ¶ 23, 147 P.3d at ¶ 23.  Hughes further contends in his objection to Valley Bank's proof of claim that "[t]he claim of Valley Bank of Ronan should be reduced, as appropriate, by the award to the Debtor upon resolution of Debtor's counterclaim." Hughes additionally stated that the Valley Bank claim "is subject to an offset for the Debtor's counterclaim against [Valley Bank].  Hughes, in initiating the counterclaim to Valley Bank's foreclosure suit, in objecting to Valley Bank's proof of claim and in requesting that the objection be consolidated with adversary proceeding, is invoking this Court's equity jurisdiction to restructure the Hughes-Valley Bank relationship through the claims-allowance process.  The right to a jury trial even on historically tried claims is given up when the claims-allowance process is pursued.  *Worldcom*, 378 B.R. at 753.  With the invocation of a "public right" – the claims-allowance process provided through equity jurisdiction, Hughes has given up his right to a jury trial on any legal claims.

Valley Bank further contends that Hickman is precedent for the proposition that by filing bankruptcy Hughes invoked the equitable jurisdiction of the bankruptcy court to restructure his

10

debtor-creditor relationship.  This Court concludes that *Hickman* is not precedent, but is

persuasive authority, but is distinguishable as discussed below.  *See See Bank of Maui v. Estate*

*Analysis*, 904 F.2d 470, 472 (9th Cir. 1990) (whether a BAP decision is controlling has not been

decided by the circuit); *In re Windmill Farms, Inc.*, 70 B.R. 618 (9th Cir. BAP 1987), *rev'd on*

*other grounds*, 841 F. 2d 1467 (9th Cir. 1988) (BAP decisions must be binding on all bankruptcy

courts in the circuit.); and *In re Sawicki*, 2008 WL 410229 (Bankr. D. Ariz. 2008) (Judge Charles

Case concluded he would be bound by bankruptcy appellate panel opinions).  This Court has not

issued a general decision that it will be bound by all bankruptcy appellate opinions.

     Judge Christopher Klein, on behalf of the panel, in *Hickman* noted in a footnote as

follows:

> This appeal involves only a chapter 7 debtor's rights in bankruptcy litigation
> involving adjustment of the debtor-creditor relationship.  We do not address
> actions that do not implicate the debtor-creditor relationship.  Whether a trustee, or
> a debtor under another chapter, may have a jury right is left to another day.  *See*
> *Germain*, 998 F.2d at 1329-30 (chapter 7 trustee entitled to jury trial on
> postpetition cause of action).

*Hickman*, 384 B.R. at 840, n.5.  Valley Bank as noted filed proof of claim no. 8 and the objection

to that claim has been consolidated with this adversary proceeding.  This adversary proceeding

began from the removal of a state court action.  Hughes counterclaims are based upon allegations

of negligence and negligent misrepresentations regarding alleged representations by Valley Bank

personnel about the check settlement process.  If Valley Bank had demanded a jury trial on any

issue so triable, it would have given up its right to a jury trial by filing a proof of claim.  *See*

*Langenkamp*, 498 U.S. at 44, 111 S.Ct. at 330.  Hughes filed his bankruptcy case after a state

court judge denied Hughes' motion to stay a foreclosure sale.  Hughes' filing of his bankruptcy

petition imposed the automatic stay that stopped the foreclosure sale that was proceeding after the Montana supreme court affirmed Valley Bank's foreclosure judgment and remanded Hughes' counterclaims on a limited issue.  Hughes then removed the state court action and commenced this proceeding.  Unlike the facts in *Hickman*, Hughes has not valued the amount of his counterclaims.  The amount recoverable under the alleged counterclaims could be greater than, equal to, or less than the foreclosure judgment recovered by Valley Bank.[1]  Hughes counterclaims could be more than a setoff, or they could be solely a offset given the conclusion reached by the Montana supreme court that Hughes may be able to obtain a judgment to compensate him for the charge-back debt.  Further Hughes' status as a debtor in a chapter 12 case is distinguishable from Hickman, who was a chapter 7 debtor.  In a chapter 7 case, a trustee is appointed to administer the property of the estate.  As Hughes filed a chapter 12 case, he has all the rights and powers and shall perform all the functions and duties of a chapter 11 trustee. 11 U.S.C. §§1203 and 1106.  Under 11 U.S.C. § 1106, Hughes is to perform some of the duties of a chapter 7 trustee, including accounting for all property.  11 U.S.C. § 1106 and 704.  Further, Hughes has the capacity to sue and be sued.  11 U.S.C. § 323.  Consequently, Hughes' status and duties are similar to the chapter 7 trustee in *Hickman*.  In *Hickman*, the debtor raised a defensive offset, even though the chapter 7 trustee held the counterclaims as property of the estate.  The debtor did not have control over the counterclaims except to raise them as a defensive offset.  Hughes, in this proceeding, holds the counterclaims for the benefit of the estate, subject to offset against Valley Bank's proof of claim.

---

[1] By amended notice of sums due under judgment filed with the state court and dated July 5, 2007, Valley Bank disclosed a total judgment of $697,386.51, with per diem interest accruing at the amount of $163.974058.  Also, Valley Bank's proof of claim states a debt of $730,373.45.

Given Judge Klein's reference to *Germain v. Connecticut Nat'l Bank*, 998 F.2d 1323 (2ⁿᵈ

Cir. 1993), in note 5 of *Hickman*, and given the similarities of duties between a chapter 7 trustee

and a chapter 12 debtor in possession in pursuing litigation that constitutes property of the estate,

a brief discussion of *Germain* is appropriate.  In *Germain*, debtor filed bankruptcy.  Creditor filed

a proof of claim for an unpaid debt.  Six month later, the trustee filed a state court action against

creditor requesting money damages for alleged acts constituting tortious interference of business,

coercion and duress, breach of contractual duty of good faith, unfair and deceptive business

practices and misrepresentation.  Creditor removed the state court action to bankruptcy court.

The courts examining the litigation found the trustee's allegations to have occurred after the

filing of the bankruptcy case.  *Germain*, 998 F.2d at 1325-26.  The second circuit panel stated:

> The Trustee's action here is
>
> > quintessentially [a] suit[] at common law that more nearly
> > resemble[s] state-law contract [and tort] claims brought by a
> > bankrupt corporation to augment the bankruptcy estate that [it
> > does]creditors' hierarchically ordered claims to a pro rata share of
> > the bankruptcy res.

*Germain*, 998 F.2d at 1329.  In a more recent second circuit case, the panel in *Bankruptcy*

*Services, Inc., v. Ernst & Young (In re CBI Holding Company)*, 529 F.3d 432, 441-43 (2ⁿᵈ Cir.

2008), considered a factual situation similar to Hughes that is distinguishable from *Germain*.  In

*CBI Holding*, Ernst & Young filed a proof of claim in the CBI Holding bankruptcy case for

unpaid professional services.  An authorized agent for CBI Holding commenced an adversary

proceeding complaint alleging that it should be entitled to damages against Ernst & Young for

breach of contract, negligence, negligent misrepresentations, fraud and/or recklessness, breach of

fiduciary duty and expungement of Ernst & Young's proof of claim.  In considering whether

13

Ernst & Young's rights to a jury trial were violated, the panel stated:

> [Ernst & Young ("E & Y")] argue[s] that because the *Germain* Court's characterization of the debtor's claims also applies to CBI's claims, E & Y is entitled to a jury trial under *Germain*. E & Y's argument is unpersuasive because the relationship between the creditor's and debtor's claims in *Germain* is materially different than that between CBI's and E & Y's claims here. In particular, the debtor's claims in *Germain* were not asserted to counter the proof of claim that the creditor filed in its bankruptcy proceedings. *Id*. at 1325. Indeed, the debtor in *Germain* did not object to the creditor's proof of claim, which was based entirely on pre-bankruptcy business dealings between the debtor and creditor. *Id*. Rather, the debtor commenced independent litigation in state court six months later solely directed at the creditor's conduct after the debtor filed for bankruptcy. *Id*. The only reason the debtor's claims ended up in bankruptcy court was because the creditor removed them from state court. *Id*. Thus, resolution of the debtor's claims in *Germain* would not affect the equitable restructuring of the debtor-creditor relationship in debtor's bankruptcy proceeding. By contrast, here, the CBI claims were asserted in the bankruptcy proceedings to counter E & Y's Proof of Claim, and their resolution would directly affect the bankruptcy court's equitable restructuring of the debtor-creditor relationship. Indeed, the *Germain* Court explicitly distinguished this type of a situation--where the action in which a jury trial is sought is actually part of the claims-allowance process:

>> A different result might adhere if the action had become part of the claims-allowance process.... An action that bears directly on the allowance of a claim is integrally related to the equitable reordering of debtor-creditor and creditor-creditor relations. If an equitable reordering cannot be accomplished without resolution of what would otherwise be a legal dispute, then that dispute becomes an essential element of the broader equitable controversy.

> *Id.* at 1329 (internal citation omitted). Therefore, *Germain* does not alter the well-established principle that [E & Y is] not entitled to a jury trial on the CBI claims that are integral to, and directly affect the allowance of, the proof of claim they filed with the bankruptcy court.

*CBI Holding*, 529 F.3d at 467-68.  The facts in Hughes are similar to *CBI Holding* and

distinguishable from *Germain* and Judge Klein's comment in n.5 of *Hickman*.  Valley Bank

initiated a foreclosure action to recover on a note and mortgage Hughes signed and delivered to

14

Valley Bank arising from a charge-back debt.  A transactional nexus exists between the note and mortgage foreclosed by Valley Bank and the counterclaims alleged by Hughes.  The operative facts are the same.  *See CBI Holding*, 529 F.3d at 461-62.  Valley Bank's proof of claim arises from the foreclosure action associated with a charge-back debt to Hughes' checking account and Hughes counterclaims arise from the alleged representations made by Valley Bank personnel concerning the check settlement process that subsequently created the charge-back debt.  As noted by the Montana supreme court, "while Hughes bore the obligation to repay Valley Bank to satisfy the bank's right of charge-back . . ., it . . . is possible for Hughes to obtain a judgment to compensate him for the charge-back debt . . . ." *Valley Bank of Ronan*, 2006 MT at ¶ 23, 334 Mont. at ¶23, 147 P.3d at ¶23.

The Court finds the facts in *Germain* are distinguishable from the facts in this adversary proceeding and the facts in Hughes are similar to the facts in *CBI Holding*.  Hughes counterclaims and Valley Bank's proof of claim involve the claims-allowance process invoking the Court's equitable jurisdiction.  Hughes is not entitled to a jury trial.

The Court concludes with an additional point.  Hughes in his counterclaims requests in his prayer for relief "[a]ny other relief the Court deems just."  This prayer invokes the Court's equitable jurisdiction.  As noted in another decision rendered by this Court, *Womack v. Horob Livestock, Inc. (In re Horob Livestock, Inc.)*, 2007 WL 2915017 *5 (Bankr. D. Mont. Oct. 4, 2007) (quoting *Pettigrew v. Graham (In re Graham)*, 747 F.2d 1383, 1388 (11th Cir 1984)), this type of prayer is "a direct appeal to the court's equity power to fashion any remedy necessary to satisfy the ends of justice."

Based upon the foregoing memorandum, the Court will issue the following separate

15

order:

IT IS ORDERED that Valley Bank's objection to Hughes demand for a jury trial is sustained; and that the Court strikes the jury demand requested by Defendant Charles R. Hughes, Trustee under the Charles R. Hughes Loving Trust.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana